AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico    ▾

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**6713 LUELLA ANNE DRIVE NE<br>ALBUQUERQUE, NEW MEXICO 87109** | )<br>)<br>)<br>)<br>)<br>) |

Case No. **26-MR-926**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

   See Attachment A

located in the _____ District of _____ **New Mexico** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

   See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ☑ evidence of a crime;

   ☑ contraband, fruits of crime, or other items illegally possessed;

   ☑ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. sections<br>793(e); 1924 | Gathering, Transmitting, or Losing Defense Information;<br>Unauthorized removal and retention of classified information |

The application is based on these facts:

**See Attached Affidavit**

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Patrick Wiegleb, Special Agent, FBI**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
**telephonically sworn and electronically signed**    *(specify reliable electronic means)*.

Date:    May 4, 2026

_____
*Judge's signature*

City and state:    Albuquerque, New Mexico

John F. Robbenhaar, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF SEARCH OF:<br>**6713 LUELLA ANNE DRIVE NE**<br>**ALBUQUERQUE, NEW MEXICO 87109** | Case No.<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

1.      I, Patrick Wiegleb, being first duly sworn, hereby depose and state as follows:

### Introduction

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 6713 Luella Anne Drive NE, Albuquerque, NM 87109 (the "SUBJECT PREMISES"), more fully described in Attachment A, for the items described in Attachment B.

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since February 2018. As such, I am a law enforcement officer of the United States within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 793. I am currently assigned to the FBI Counterintelligence Squad in Albuquerque, New Mexico, where my duties include investigating violations associated with national security information, including the mishandling or theft of information related to national defense, as well as the use of computers and electronic storage media by persons involved in such activity.  I have received on the job training from other agents in the investigation of federal offenses. My investigative training and experience includes, but is not limited to, conducting surveillance; interviewing subjects, victims, and witnesses; writing affidavits for search warrants and criminal

1

complaints; collecting evidence; and learning legal matters including topics related to Fourth Amendment searches. I have previously participated in investigations and search warrants related to national security matters. I have also received training and have experience in obtaining, receiving, and reviewing electronic records, including obtaining forensic extractions of computers and cellular telephones, and reviewing data obtained from computers and cellular telephones.

4.    This affidavit is made in support of an investigation concerning the retention of defense information in violation of 18 U.S.C. § 793(e) and the unauthorized removal and retention of classified documents in violation of 18 U.S.C. § 1924(a) ("TARGET OFFENSES"). Based on the facts set forth in this Affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed and may continue to be committed by Eric Gustafson (GUSTAFSON), who resides at the SUBJECT PREMISES.

5.    I have personally participated in the investigation detailed in this affidavit. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other federal agents, and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Because this affidavit is being submitted for the limited purpose of securing an order authorizing the acquisition of this search warrant, I have not included details of every aspect of the investigation. Facts not set forth herein are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application. The facts in

this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Eric Conrad Gustafson has committed violations of 18 U.S.C. §§ 793(e) and 1924(a). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## Applicable Criminal Statues and Definitions

7.      Pursuant to 18 U.S.C. § 793(e), it is an offense for "whoever, having unauthorized possession of, access to, control over, over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation . . . willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it," and for which an offender shall be fined or imprisoned not more than ten years, or both. In addition, pursuant to 18 U.S.C. § 1924(a), "whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than five years, or both." As described more fully below, I have reason to believe that national defense information

3

including classified information was removed from its proper place of storage and transported to the SUBJECT PREMISES by GUSTAFSON, and that copies of that information have been retained at the SUBJECT PREMISES.

8.    "Classified information of the United States" is defined in 18 U.S.C. § 1924(c) as "information originated, owned, or possessed by the United States Government concerning the national defense or foreign relations of the United States that has been determined pursuant to law or Executive order to require protection against unauthorized disclosure in the interests of national security."

**Probable Cause**

9.    ERIC GUSTAFSON worked in various capacities as a mechanical engineer and mechanical engineering team lead at Sandia National Laboratories ("SNL") for approximately 52 years, from approximately January 25, 1973, until October 28, 2025, primarily in the nuclear weapons research and development areas.  On October 28, 2025, GUSTAFSON retired from SNL.  Prior to his retirement, on approximately October 27, 2025, the SNL Office of Counterintelligence (OCI) notified the Federal Bureau of Investigation (FBI) that on October 24, 2025, approximately 100,000 SNL files were transferred from an unclassified network computer assigned to GUSTAFSON onto removable hard drives. The files were transferred from the Sandia Restricted Network (SRN), which is an unclassified network used at SNL to use and store unclassified information. SNL OCI found that the files included documents with file names indicating that the documents were For Official Use Only (FOUO), Controlled Unclassified Information (CUI), and/or Export Controlled Information (ECI). SNL OCI initiated an internal investigation and identified multiple file transfers from GUSTAFSON's SNL computer to external hard drives that GUSTAFSON had removed from SNL premises. At approximately 7:00 am on the Thursday of GUSTAFSON's final week at SNL, GUSTAFSON's manager instructed

4

GUSTAFSON to go home and get the hard drives and return them to SNL. GUSTAFSON brought two hard drives and his SNL laptop back to SNL at approximately 11:30 am that day. Around noon the next day, GUSTAFSON returned the final hard drive.

### *Forensic Examination of Hard Drives*

10.     Forensic examiners employed by the Counterintelligence Forensics Laboratory at SNL OCI conducted a preliminary examination of the hard drives returned by GUSTAFSON to SNL as well as the SRN workstation assigned to GUSTAFSON when he was employed at SNL. Specifically, examiners reviewed GUSTAFSON's workstation, which included a Dell Precision 5820 computer with serial number H0XZCP2, a Western Digital 500GB HDD-0 hard drive with serial number WCAWF4022181, a Seagate Barracuda 1TB hard drive with serial number Z9AQ0CQ1, a Toshiba 256GB SSD hard drive with serial number 484S11EHT61Q, and an HGST 1TB SSD hard drive with serial number 180413JR1000BNHPDKTE. Examiners also reviewed the hard drives that GUSTAFSON returned to SNL, which included a Seagate portable 2TB hard drive with serial number NT3F1YLR, a Seagate portable 2TB hard drive with serial number NT36J72P, and a Seagate portable hard drive with serial number NACM0P96.

11.     On October 29, 2025, the Examiner took possession of the listed devices and successfully completed a forensic image and verification of the items in order to ensure that the archived copy matched the original evidence items. The listed devices contained over 10TB of data with approximately 15 million artifacts.

12.     The SNL OCI Examiner physically examined the submitted devices and recorded available identifying features and numbers. All digital media used for creating archival copies of the forensic images were forensically sanitized or "wiped" prior to beginning the examination. The forensic images were obtained from the original submitted items and forensically verified to match both MD5 and SHA hash values

using an industry standard forensic imaging/extraction tool. Master and working copies of the forensic images were created and all forensic activities related to the examination were completed against the working copies.

13.     Between approximately December 19, 2025, and January 15, 2026, the Examiner conducted a search for any files that were marked as classified information. Categories of classified information included Secret, Top Secret, Restricted Data, Formerly Restricted Data, Sensitive Compartmented Information, and Sigma-15. The United States Government applied the Secret classification level to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security. The Top Secret classification level was applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security. Sensitive Compartmented Information was defined as classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems. Restricted Data was defined by the Department of Energy (DOE) as all data concerning design, manufacture, or utilization of atomic weapons; production of special nuclear material; or use of special nuclear material in the production of energy, but excluding data declassified or removed from the Restricted Data category pursuant to 42 U.S.C. 2162. Formerly Restricted Data was defined by DOE as classified information that the Department of Energy and the Department of Defense jointly determined to be related primarily to the military use of atomic weapons and removed by the Department of Energy from the category of Restricted Data under section 142(d) of the Atomic Energy Act of 1954 (as amended). Sigma-15 was defined by DOE as that category of sensitive information concerning the design and function of nuclear weapon use control systems, features, and components.

14. The Examiner used keywords to search for materials marked as classified. In reviewing the electronic devices, the Examiner located 97 documents marked as being classified "Secret," nine documents marked as "Secret Restricted Data," 15 documents marked as "Secret Formerly Restricted Data," 30 documents marked as "Sigma-15," and one document marked as "Top Secret/Sensitive Compartmented Information."

15. The Dell workstation, including the Dell computer and four hard drives, was permitted only for unclassified activities on the SRN and should not have contained any classified information. On the Dell workstation alone, the Examiner located 66 documents marked as "Secret," 24 documents marked as "Secret/Restricted Data," 13 documents marked as "Secret/Formerly Restricted Data," 11 documents marked as "Sigma-15," and one document marked as "Top Secret/Sensitive Compartmented Information."

16. The Examiner also located documents marked as classified on the three external hard drives that GUSTAFSON removed from SNL and later returned. These hard drives were approved for use and storage of only unclassified activities and no classified materials should have been present on these drives. On the three Seagate hard drives, the Examiner located 41 documents marked as "Secret," three documents marked as "Secret/Restricted Data," two documents marked as "Secret/Formerly Restricted Data," 19 documents marked as "Sigma-15," and one document marked as "Top Secret/Sensitive Compartmented information."

17. The Examiner completed the analysis of the documents marked as "Sigma-15" and found that they were screenshots of a single document marked as "Sigma-15." These images were "carved," meaning they were embedded into a document. The Examiner located the documents and found that the Sigma-15 screenshot was cropped to only show a figure. The documents in which the cropped screenshots were found were marked as "Controlled Unclassified Information/Export Controlled Information," but the entire Sigma-15 image was

7

still located inside the documents. This meant that if the screenshot image was copied out of the document and pasted elsewhere, the full image would still be seen revealing the "Sigma-15" classification markings.

### *Interview of Individual 1*

18.     I interviewed GUSTAFSON's manager, "Individual 1," on November 6, 2025. Individual 1 said that SNL information technology (IT) department had informed Individual 1 that a large number of files had been transferred from GUSTAFSON's computer on the SRN to an external hard drive on approximately October 17, 2025. In or about October or November 2025, Individual 1 talked to GUSTAFSON about the file transfer. GUSTAFSON denied having transferred files to a hard drive. GUSTAFSON later told Individual 1 that he had "burned" files onto compact discs. Individual 1 instructed GUSTAFSON to return the compact discs. Approximately three or four days after the initial conversation, GUSTAFSON returned to work and told Individual 1 that he could not find the compact discs and gave Individual 1 an external hard drive. Individual 1 observed that the hard drive had the same serial number as the hard drive to which the IT department had observed the file transfer. Individual 1 reviewed the hard drive and found that it contained files related to several nuclear weapons programs that GUSTAFSON had worked on during his time at SNL.

19.     After observing the file transfer in October, SNL IT reviewed IT records and found additional file transfers associated with GUSTAFSON. SNL IT found that, in approximately April 2025, GUSTAFSON copied files from the SRN onto a hard drive. This file transfer was not detected and flagged by SNL IT systems at the time the transfer occurred.  GUSTAFSON conducted four separate file transfers from his SNL unclassified workstation to external hard drives between April 2025 and October 2025. On or about October 23, 2025, Individual 1 told GUSTAFSON to go home and get the hard drives and return them to SNL. GUSTAFSON left SNL for approximately four and a half hours and

8

returned with two hard drives and his SNL laptop. Around noon the next day, October 24, 2025, which was GUSTAFSON's final day of work at SNL before his official retirement on October 28, 2025, GUSTAFSON arrived around noon and returned the fourth hard drive.  GUSTAFSON told Individual 1 on that day that GUSTAFSON took the files because he wanted something to remember his time at SNL.

20.    According to Individual 1, GUSTAFSON had access to the Sandia Classified Network (SCN), in addition to the SRN. The SCN was a classified SNL network that was certified to handle information classified up to SECRET//RESTRICTED DATA.

21.    During the time that Individual 1 was GUSTAFSON's manager, Individual 1 observed that GUSTAFSON tended to keep items for a long time. When GUSTAFSON worked for Individual 1, GUSTAFSON had "piles of boxes" full of materials from previous jobs he had had at SNL. The boxes included old sets of plans from nuclear weapons programs that GUSTAFSON had worked on over his 52 years at SNL. Individual 1 estimated that GUSTAFSON had approximately 10-15 cardboard boxes full of paper files in his office. Prior to GUSTAFSON's retirement, Individual 1 saw GUSTAFSON going through the boxes and disposing of some materials by shredding them. Individual 1 observed that GUSTAFSON seemed to be reviewing the material in the boxes and appropriately disposing of the documents. After GUSTAFSON left SNL, Individual 1 carefully checked GUSTAFSON's office for sensitive items and found none. Coworkers packed two to three boxes of personal items for return to GUSTAFSON. Individual 1 checked these boxes carefully and confirmed that they did not contain SNL materials.

### *Interview of Individual 2*

22.    On February 26, 2026, I interviewed GUSTAFSON's coworker "Individual 2," who worked closely with GUSTAFSON at SNL for approximately ten years, including the end of GUSTAFSON's employment at SNL. Individual 2 stated that GUSTAFSON had

worked at SNL for over 50 years before retiring. During his time at SNL, GUSTAFSON worked as an engineer on every United States nuclear weapons system. GUSTAFSON was very knowledgeable and remembered details easily until the final two to three years of his employment, when he became "forgetful." Individual 2 stated that GUSTAFSON worked longer hours than anyone else on their team and that GUSTAFSON told Individual 2 that GUSTAFSON "had nothing else to do." Individual 2 believed that in 2025, GUSTAFSON had started plugging devices into SNL computers and that GUSTAFSON was told multiple times not to do so.

23.     Individual 2 stated that GUSTAFSON retired from SNL as part of a Voluntary Separation (VOLSEP) program at SNL. GUSTAFSON had been at SNL so long that he was receiving his salary and pension simultaneously, according to Individual 2.  During his last two months at SNL, GUSTAFSON became "unpleasant" toward his colleagues. Individual 2 stated that prior to taking retirement through the VOLSEP program, GUSTAFSON had told colleagues that VOLSEP was a terrible program and nobody should participate in it.

24.     Individual 2 stated that GUSTAFSON understood security regulations associated with classified information very well. GUSTAFSON was a derivative classifier, which the Department of Energy defines as an individual authorized to confirm that an unmarked document or material is unclassified or determine that it is classified as allowed by his or her description of authority. GUSTAFSON had dealt with classified information his entire career at SNL and Individual 2 stated that dealing with classified information was "second nature" to GUSTAFSON. In their work, GUSTAFSON and Individual 2 dealt with classified information at all levels of classification on a daily basis.

25.     Individual 2 described GUSTAFSON as a "pack rat" who kept a great deal of information from his time at SNL. While Individual 2 worked with GUSTAFSON, GUSTAFSON had approximately 15 banker's boxes full of papers related to prior work he

10

had done at SNL. GUSTAFSON moved these boxes from office to office over the years but did not unpack them. Individual 2 saw papers and items from many years earlier in GUSTAFSON's office while they were working together. Individual 2 stated that he believed GUSTAFSON may have kept records and items from years ago at his house (the SUBJECT PREMISES) as well, because Individual 2 knew that GUSTAFSON's house had a large garage but GUSTAFSON did not park his cars in the garage.

### *Subject Premises*

26.     SNL OCI provided information from GUSTAFSON's personnel records at SNL. The records indicated that GUSTAFSON's home address was 6713 Luella Anne Drive Northeast, Albuquerque, New Mexico 87109. I reviewed public records available from the Bernalillo County Assessor's Office at https://www.bernco.gov/assessor/find-a-property/assessor-property-record-search-portal/. Those records indicated that the SUBJECT PREMISES were owned by E.C. GUSTAFSON.

27.     On April 9, 2026, I conducted physical surveillance at the SUBJECT PREMISES. I observed three vehicles parked in the driveway and in front of the SUBJECT PREMISES: a white Toyota Tundra with New Mexico license plate NYA592, a white Toyota Tacoma with New Mexico license plate MSZ012, and a red and white Ford Bronco II with New Mexico license plate KYM550. According to records obtained from the New Mexico Motor Vehicle Division, the Toyota vehicles were both registered to Eric C. Gustafson and Carolyn Gustafson, while the Ford was registered to Carolyn Gustafson. All of the vehicles were currently registered at the address of the SUBJECT PREMISES.

### *Need for a Search Warrant*

28.     The items sought constitute evidence and instrumentalities of 18 U.S.C. § 793 and 18 U.S.C. § 1924. Further, based on my training and experience in investigating federal crimes, I know individuals involved in the unlawful retention of classified and national

11

defense information tend to keep and maintain the type of evidence listed in Attachment B, i.e., classified or sensitive documents, at their homes after they successfully remove it from the work site.

29.    Based on my training and experience, I know that it is possible to transfer large amounts of data including documents, images, presentations, and other types of files from external hard drives to other computers or electronic storage media, and that such file transfers can occur in a short amount of time. Based on my training and experience I also know that data can be copied from an external hard drive onto another computer or electronic storage device without removing the data from the external hard drive, so that data could be copied from a hard drive onto another computer while leaving the contents of the hard drive intact.

30.    Based on my training, experience, and participation in investigations including experience gained in executing search warrants for documents, files, records, and other evidence, I know:

    a.  The documents and items described in attachment B are the type of documents, files, records, and other items used in the normal course of business by persons engaged in work related to national defense.

    b.  Individuals who engage in illegal activity related to national defense information are not unlike any other individual in our society in that they often maintain important documents and records. These documents and records may be retained for long periods of time, regardless of whether their value to the individual has diminished. Oftentimes, this type of evidence is generated or collected, maintained, and subsequently forgotten about. Hence, documents that one would normally think a prudent person would destroy because of their incriminating nature are still possessed months, or even years, after they come

12

into the subject's possession. Oftentimes these individuals do not even realize the incriminating nature of the documents they keep or believe that others will not appreciate the incriminating nature of the material.

c. Individuals who engage in communication via email, including the sending of electronic files attached to emails, also have a tendency to maintain the electronic records or files. If individuals do not purposely maintain them, they often forget to delete or remove them from their email accounts.

d. In my training and experience, individuals transport and/or store documents and/or computers in their automobiles. GUSTAFSON commuted between his home and SNL in his automobile.

e. In my training and experience, individuals who commit crimes related to the mishandling of national defense information often utilize sophisticated electronic and communication equipment to assist them in their activities, e.g. computers, facsimile machines, portable and cellular telephones, and electronic storage devices. Computer storage devices, such as removable hard drives, can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, s/he often stores it in random order with deceptive file names. GUSTAFSON transferred SNL files, including classified information, from his SNL computer to removable hard drives which he removed from SNL property for several days.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

31. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic

13

storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.    I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging

14

files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

33.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus

15

enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The

16

existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

17

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

34. *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

35. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

36. Because GUSTAFSON shares the SUBJECT PREMISES as a residence with his wife, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any

19

of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## Conclusion

37.    Based on the forgoing, your affiant respectfully requests that the Court issue the proposed search warrant as there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the evidence of these offenses, more fully described in Attachment B of this Application, are located in the SUBJECT PREMISES, described further in Attachment A of this Application. Your affiant respectfully requests that this Court issue a search warrant for SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachments B.

Respectfully submitted,

*Patrick Wiegleb*

Patrick Wiegleb

Special Agent

Federal Bureau of Investigation

Subscribed electronically and sworn telephonically to me on <u>May 4, 2026</u>.

_____

JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

## Attachment A

*Property to be searched*

Subject Premises: 6713 Luella Anne Drive Northeast, Albuquerque, New Mexico 87109 to include any and all vehicles, sheds, temporary structures in the curtilage and front and backyards of the property.

The Subject Premises is a single-family house. The house is located on the north side of Luella Anne Drive, on the corner of Luella Anne Drive and an adjacent cul-de-sac of the same name. The house is a single-story structure with a brick façade and a garage facing the cul de sac on the northeast corner of the structure. The front yard is grass with several bushes and trees and a paved driveway onto the cul de sac.



## ATTACHMENT B

*Property to be seized*

1.      All records relating to violations of 18 U.S.C. §§ 793 and 1924, those violations involving ERIC GUSTAFSON, including:

   a.   Documents, records, papers, or other items marked as classified information;

   b.   Documents, records, papers, or other items determined to contain classified information, regardless of markings;

   c.   Records and information relating to Sandia National Laboratories;

   d.   Records and information relating to the improper or unauthorized transmission or transfer to another person or entity of any classified information or information marked as classified.

**2.**      Computers or storage media used as a means to commit the violations described above, including unauthorized removal, possession, and retention of classified documents or material in violation of 18 U.S.C. §§ 793 and 1924.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as

evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

4.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disk drives or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

5.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

6.    The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.